IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **URGENT CARE BY THE BAY, LLC** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| vs. | *  CIVIL ACTION NO.: |
| | * |
| **UNITED STATES OF AMERICA** | * |
| | * |
| **Defendant.** | * |

## COMPLAINT

URGENT CARE BY THE BAY ("URGENT CARE") brings this action against the United States pursuant to 26 U.S.C. § 7422, for a refund of internal revenue taxes totaling $403,086.35 (plus interest) owed to it (the "ERC refunds") – and wrongfully denied by the Internal Revenue Service ("IRS") – as Employee Retention Credits ("ERC").[1] Under the Coronavirus Aid, Relief, and Economic Security Act, PL 116-136, March 27, 2020, 134 Stat 281 ("CARES Act") and Internal Revenue Code § 3134, which created the ERC, Plaintiff is entitled to ERC refunds for the tax periods ending September 30, 2020 ("Q3 2020"), December 31, 2020 ("Q4 2020"), March 31, 2021 ("Q1 2021"), June 30, 2021 ("Q2 2021"), and September 30, 2021 ("Q3 2021").

### NATURE OF ACTION

1.      Plaintiff files this civil action under I.R.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney fees), authorized to be paid to Plaintiff under I.R.C. § 3134 and the CARES Act, but wrongfully denied by the IRS. This Complaint is proper under 28 U.S.C. § 2401 and under I.R.C.

---

[1] Employee Retention Credits or ERC are also interchangeably referred to as Employee Retention Tax Credits or ERTC.

§§ 6532 and 7422, as Plaintiff's ERC claims were duly filed more than 6 months prior to the filing of this Complaint.[2]

## PARTIES

2. Plaintiff URGENT CARE is a full-service urgent care medical facility that performs walk-in medical services and emergency medical treatment for illnesses and injuries that are not life-threatening and do not require hospital treatment. Plaintiff is located in Daphne, Alabama.

3. The Defendant is the United States of America.

## JURISDICTION AND VENUE

4. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331, 1340, and 1346(a)(1), and under 26 U.S.C. (I.R.C.) § 7422.

5. Venue in this Court is proper under 28 U.S.C. § 1402(a)(2) and 1391(e)(1), as Plaintiff's principal place of business is located in this judicial district.

6. This Complaint is timely under 28 U.S.C. § 2401(a) and under I.R.C. §§ 6532(a)(1) and 7422(a) because Plaintiff filed a claim for its ERC refund with the Secretary more than six months prior to the date of filing this Complaint.

## THE EMPLOYEE RETENTION CREDIT

7. Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in governmental orders to address the pandemic that disrupted the United States' local and national economies. Those orders formed a nexus of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID-19. The governmental

---

[2] See Exhibit "A"-Plaintiff's 941X for Q3 2020, Q4 2020, Q1 2021, Q2 2021, Q3 2021, and Form 2848 Power of Attorney that was attached to each 941X.

response to that public health emergency involved historically unprecedented measures, including lock down orders, social distancing mandates, and forced business closures. The economic effects of those policies were profound. Deemed the "greatest threat to prosperity and well-being the US has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVID-19 were forecast at $16 trillion.[3]

8. In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, enacted in March 2020. Section 2301 of the CARES Act created the ERC.[4]

9. The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on U.S. businesses from the unprecedented challenges posed by the pandemic. Congress intended for the credit to be broadly applicable to help businesses survive a historic pandemic that disrupted the global economy. The credit is available to certain eligible employers for the last three quarters of 2020 and for the first three quarters of 2021.

10. The ERC is a payroll tax credit available to certain employers who qualify under the CARES Act. Employers file an amended quarterly payroll tax return (a 941X) with the IRS to claim the ERC credit.

11. Plaintiff URGENT CARE duly claimed ERC credits for tax periods ending September 30, 2020 ("Q3 2020"), December 31, 2020 ("Q4 2020"), March 31, 2021 ("Q1 2021"),

---

[3] Alvin Powell, *What might COVID cost the U.S.? Try $16 trillion*, The HARVARD GAZETTE, Nov. 10, 2020. https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16-trillion/.

[4] Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, §2301, 134 Stat 281 (March 27, 2020).

June 30, 2021 ("Q2 2021"), and September 30, 2021 ("Q3 2021"). The IRS has taken no action on Plaintiff's claims, which are the subject of this suit for refund, for more than six months.

### Threshold Requirement – 3 Ways to Qualify for an ERC

12. An employer is eligible to claim an ERC if it carried on a trade or business during the quarter at issue and satisfies one of three prongs for eligibility: (1) significant declining gross receipts; (2) full or partial suspension of operations due to government orders, or (3) recovery startup business.[5] CARES Act § 2301(c)(2); I.R.C. § 3134(c)(2).[6]

### The Suspension Test

13. A business can qualify as an eligible employer to receive ERC using the suspension test. Under this second prong for determining eligibility, an employer is eligible to claim ERC credits if "the operation of [Plaintiff's] trade or business [was] fully or partially suspended . . . due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." I.R.C. § 3134(c)(2)(A)(ii)(I). URGENT CARE clearly meets this prong.

14. Eligibility under the "suspension test" under the CARES Act § 2301(c)(2) or I.R.C. § 3134(c)(2)(A)(ii)(I) contains no financial element whatsoever.

15. The CARES Act § 2301(c)(2) and I.R.C. § 3134(c)(2)(A)(ii)(I) do not require eligible employers to have suffered any decline in gross receipts at all in order to qualify for ERC credits using the suspension test. Also, the suspension test does not require an employer's business

---

[5] Plaintiff is not a "recovery startup business" as defined under I.R.C.§3134(c)(2)(A)(ii)(III), and so it does not claim ERC credits thereunder, nor does it claim the credit under the significant decline in gross receipts prong.

[6] The current version of I.R.C. § 3134 became effective on November 15, 2021, and, as relevant here, is identical to the version of I.R.C. § 3134 in effect from March 11, 2021, to November 14, 2021, and to the version of the CARES Act in effect from January 1, 2021, to March 10, 2021. For ease of reference, this Complaint cites I.R.C. § 3134 when discussing 2021 ERC requirements.

to shut down completely at any point at all during the pandemic.[7]

## URGENT CARE's Eligibility for the Credit

16. URGENT CARE duly filed for and is eligible to receive ERC under the suspension test for Q3 2020, Q4 2020, Q1 2021, Q2 2021, and Q3 2021.

17. Despite URGENT CARE's ERC eligibility for all quarters claimed, the IRS has ignored these claims.

## The ERC Generally

18. Employers who qualify for the ERC in 2020 may receive a maximum tax credit of $5,000 per employee for all wages paid from March 13, 2020-December 31, 2020.[8] To assist employers even more in the pandemic, Congress widely expanded the program in 2021. For the first three quarters of 2021, the employer may receive an ERC of up to $7,000 per employee for each quarter in which they qualify.[9]

19. The amount of ERC is not limited to the amount of employment taxes the employer paid, and against which the credit is applied. Rather, if the amount of the credit exceeds the applicable employment taxes for the calendar quarter, "such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." CARES Act § 2301(b)(3); I.R.C. § 3134(b)(3).

---

[7] In fact, IRS Notice 2021-20 interprets a partial suspension to occur if the employer's operations continue but "are subject to modification due to a governmental order (for example, to satisfy distancing requirements), [then] such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances." *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act* IRS Notice 2021-20 *(Answer 17)*.

[8] Coronavirus Aid, Relief, and Economic Security Act (CARES Act) §2301(a)(b)(1)(2).

[9] Consolidated Appropriations Act of 2020 (CAA), Pub. L. No. 116-260, §207(b).

## URGENT CARE BY THE BAY, LLC

20. During all applicable quarters of the pandemic, URGENT CARE BY THE BAY, LLC, was a full-service urgent care medical clinic that performed walk-in medical services and emergency medical treatment for patient illnesses and injuries that were not life-threatening and did not require hospital treatment.

21. URGENT CARE is located in Daphne, Alabama. Management and daily functions of URGENT CARE are handled in-office. Prior to the pandemic, URGENT CARE offered standard urgent care medical services to patients with non-life-threatening emergencies or after-hours medical needs seven days per week without appointment. URGENT CARE maintained a staff of physicians and healthcare practitioners who specialized in emergency medicine and urgent care practice to treat a variety of conditions from common sicknesses and injuries to more involved conditions. URGENT CARE offered clinical evaluations, DOT physicals, EKG, digital X-rays, blood work and basic labs, sutures, splints, referrals, and other medical services. The clinic is open from 8am to 6pm Monday through Friday and 8am to 3pm on Saturday and Sunday. In normal operating conditions, patients would walk in, sign in to be seen by a practitioner, wait in the waiting room until the time of service, and be seen in a clinic room for service. URGENT CARE typically cared for an average of 40-45 patients per day outside of cold and flu season and 60-67 patients per day during cold and flu season.

22. Due to government restrictions, URGENT CARE's regular operations were highly disrupted throughout the course of the pandemic. The first regulations enforced were those related to social distancing, cleaning, and PPE requirements. Practitioners at URGENT CARE were required to gear up in PPE such as tivex suits, masks, shields, gloves, gowns, etc., in order to treat patients. Dressing in and changing out of PPE throughout the day took a significant amount of

time and made the process of rendering healthcare services far less efficient. Additionally, URGENT CARE had to close the office waiting room. Instead of patients entering the clinic and waiting to be seen upon being called back to a room, URGENT CARE had to post a sign on the door with a number for patients to call and sign in. Once the patient was able to be seen, URGENT CARE would call the patient and invite them into the clinic from their car.

23. Staff and patients also had to adhere to social distancing protocols once inside the clinic. Staff had to remain socially distanced at all times, partitions had to be installed, and testing procedures had to be implemented. Anyone entering the clinic had to be temperature checked. Employees who did not pass the temperature check, who tested positive for Covid, or who were exposed to Covid or showed symptoms had to quarantine for two weeks. This caused massive staff shortages. There were numerous days that the clinic had to close early or otherwise limit operations due to staff shortages because staff members had to be sent home to quarantine. The clinic was constantly having to seek new employees and spend time recruiting new employees instead of performing other normal medical care duties. In addition to restrictions limiting available staff and requiring PPE and social distancing, government mandates also required strict cleaning measures. Each room had to be thoroughly disinfected after each patient was seen. This slowed down the turnaround time for seeing patients and completing services and caused even more work for the already burdened staff. Government restrictions and guidance were rapidly changing throughout the course of the pandemic. In addition to all the former mentioned protocols, staff also had to spend time researching and staying up to date on the most recent restrictions to be sure that the clinic was adhering to all necessary rules and guidance.

24. In addition to all the operational issues caused by government restrictions throughout the course of the Covid pandemic, restrictions also heavily burdened URGENT

CARE's supply chain. Covid tests, sanitizers, PPE, medications, and medical supplies were often unavailable or delayed. URGENT CARE often had to reserve tests only for patients presenting with symptoms and had to go without necessary supplies. The clinic even had to make their own sanitizer at one point, because standard options were not available. Companies such as McKesson, Abbot, Clydell, and others were all limited in supplies due to government restrictions on manufacturing and office operations. Because of governmental orders many of these companies were unable to fulfil orders in a timely and complete manner and URGENT CARE suffered because of it. Due to governmental orders that created a partial or full shut down of the operations of vendors and issues with transmission of products due to governmental orders, URGENT CARE experienced delays in getting many products.

25. Additionally, there were massive delays to URGENT CARE's overall processes due to restrictions on insurance companies. At times, issues with the insurance companies' inability to perform according to normal standards delayed patient healthcare services. Insurance companies also had different policies and procedures for the processing of testing services which made it even more difficult to complete the testing services for clinics like URGENT CARE. Employees of URGENT CARE had to spend additional time and resources learning the various procedures for the insurance process which again made services even less efficient.

26. Finally, URGENT CARE 's business development and marketing functions were limited due to government restrictions as well. Typically, each year the office management team would attend two conventions to evaluate and test new computer systems and technology. The conventions were cancelled, and those opportunities were lost.

27. URGENT CARE also saw a major decline in its marketing opportunities due to governmental orders during Covid.

28. URGENT CARE would typically engage with the community by sponsoring local sports teams and school programs. These marketing opportunities were also unavailable during the pandemic. Further, school closures lead to a lack of childcare which caused staffing shortages.

29. Due to the severe government restrictions enforced upon URGENT CARE limiting URGENT CARE's operations, ability to perform timely services for patients, supply chain, and business development, URGENT CARE faced a far greater than nominal impact to its entire operations, including gross labor hours and revenues.

30. CDC quarantining requirements also affected URGENT CARE's productivity. URGENT CARE had to follow the required amount of time off employees had to have off if an employee had a positive Covid test-- which was 10-14 days. URGENT CARE's staff were significantly affected by COVID, and the quarantining requirements negatively impacted URGENT CARE's operations.

31. CDC recommendations, limiting state statutes, federal regulations, vaccination requirements and rules regarding medical facilities and emergency treatments that could not be performed lasted until 2022. There were substantial limitations placed on URGENT CARE, its staff and operation, and on patients exposed to Covid, all due to governmental orders.

32. As set forth above and below, restrictions due to government orders from an appropriate governmental authority had the effect of both fully and partially shutting down URGENT CARE and had a greater than nominal impact on URGENT CARE's productivity, revenue and operations.

33. Because URGENT CARE's operations were partially suspended due to government orders that meet the statutory criteria for the claimed quarters in 2020 and 2021, URGENT CARE is entitled to its claimed ERC, plus interest, attorney fees and costs.

### Third Quarter 2020

34. On or about December 14, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q3 2020. ("Q3 2020 Form 941-X").

35. Line 18a of the Q3 2020 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $15,494.65.

36. Line 26a of the Q3 2020 Form 941-X reported that Plaintiff's refundable portion of ERC was $56,096.30.

37. Line 30 of the Q3 2020 Form 941-X reported $143,181.89 in qualified wages for the ERC.

38. Line 31a of the Q3 2020 Form 941-X reported $0 in qualified health plan expenses for the ERC.

39. Based upon the foregoing, Plaintiff timely claimed an ERC for Q3 2020 in the amount of $71,590.95.

40. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q3 2020.

### Fourth Quarter 2020

41. On or about December 14, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q4 2020. ("Q4 2020 Form 941-X").

42. Line 18a of the Q4 2020 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $11,368.43.

43. Line 26a of the Q4 2020 Form 941-X reported that Plaintiff's refundable portion of

ERC was $19,412.79.

44. Line 30 of the Q4 2020 Form 941-X reported $61,562.45 in qualified wages for the ERC.

45. Line 31a of the Q4 2020 Form 941-X reported $0 in qualified health plan expenses for the ERC.

46. Based upon the foregoing, Plaintiff timely claimed an ERC for Q4 2020 in the amount of $30,781.22.

47. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q4 2020.

### First Quarter 2021

48. On or about December 14, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q1 2021. ("Q1 2021 Form 941-X").

49. Line 18a of the Q1 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $13,850.44.

50. Line 26a of the Q1 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $85,077.26.

51. Line 30 of the Q1 2021 Form 941-X reported $141,325.30 in qualified wages for the ERC.

52. Line 31a of the Q1 2021 Form 941-X reported $0 in qualified health plan expenses for the ERC.

53. Based upon the foregoing, Plaintiff timely claimed an ERC for Q1 2021 in the amount of $98,927.70.

54. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q1 2021.

### Second Quarter 2021

55. On or about December 14, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q2 2021. ("Q2 2021 Form 941-X").

56. Line 18a of the Q2 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $14,146.07.

57. Line 26a of the Q2 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $85,246.45.

58. Line 30 of the Q2 2021 Form 941-X reported $141,989.32 in qualified wages for the ERC6.

59. Line 31a of the Q2 2021 Form 941-X reported $0 in qualified health plan expenses for the ERC.

60. Based upon the foregoing, Plaintiff timely claimed an ERC for Q2 2021 in the amount of $99,392.52.

61. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q2 2021.

### Third Quarter 2021

62. On or about December 14, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q3 2021. ("Q3 2021 Form 941-X").

63. Line 18a of the Q3 2021 Form 941-X reported that Plaintiff's nonrefundable

portion of ERC was $3,319.05.

64.	Line 26a of the Q3 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $99,074.92.

65.	Line 30 of the Q3 2021 Form 941-X reported $146,277.09 in qualified wages for the ERC6.

66.	Line 31a of the Q3 2021 Form 941-X reported $0 in qualified health plan expenses for the ERC.

67.	Based upon the foregoing, Plaintiff timely claimed an ERC for Q3 2021 in the amount of $102,393.97.

68.	The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q3 2021.

## CAUSES OF ACTION

69.	Pursuant to I.R.C. § 7422, a taxpayer may file a civil action against the United States for the recovery of taxes after a claim for refund has been filed with the Secretary.

70.	Pursuant to I.R.C. § 6532, no suit for refund shall begin (a) prior to the expiration of six months from the date of filing the claim for refund, or (b) after the expiration of two years from the date the Secretary notifies the taxpayer that its claim has been disallowed.

71.	Plaintiff satisfies each of these requirements.

66.	Plaintiff qualified for the ERC for Q3 2020, Q4 2020, Q1 2021, Q2 2021, and Q3 2021 under the suspension test.

72.	The IRS has not paid Plaintiff's ERC claims for Q3 2020, Q4 2020, Q1 2021, Q2 2021, or Q3 2021, nor has it issued a Letter 105C notifying Plaintiff that any of its claims have been disallowed.

73. The IRS has ignored Plaintiff's claims, and they have been pending for more than six months.

74. Plaintiff is entitled to the full amount of ERC claimed, together with interests pursuant to I.R.C. § 6611, as well as reasonable attorney fees and legal costs associated with this cause of action, pursuant to 28 U.S.C § 2412 and/or I.R.C. § 7430.

### Count One
### Q3 2020 Refund Claim

75. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

76. Plaintiff is an eligible employer qualified to receive $71,590.95 of ERC for Q3 2020.

77. On or about December 14, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q3 2020 in the amount of $71,590.95.

78. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $71,590.95, along with statutory interest.

### Count Two
### Q4 2020 Refund Claim

79. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

80. Plaintiff is an eligible employer qualified to receive $30,781.22 of ERC for Q4 2020.

81. On or about December 14, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q4 2020 in the amount of $30,781.22.

82. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $30,781.22, along with statutory interest.

### Count Three
### Q1 2021 Refund Claim

83. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

84. Plaintiff is an eligible employer qualified to receive $98,927.70 of ERC for Q1 2021.

85. On or about December 14, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q1 2021 in the amount of $98,927.70.

86. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $98,927.70, along with statutory interest.

### Count Four
### Q2 2021 Refund Claim

87. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

88. Plaintiff is an eligible employer qualified to receive $99,392.52 of ERC in Q2 2021.

89. On or about December 14, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q2 2021 in the amount of $99,392.52.

90. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $99,392.52, along with statutory interest.

### Count Five
### Q3 2021 Refund Claim

91. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

92. Plaintiff is an eligible employer qualified to receive $102,393.97 of ERC in Q3 2021.

93. On or about December 14, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q3 2021 in the amount of $102,393.97.

94. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $102,393.97, along with statutory interest.

## Count Six
## Attorney Fees and Administrative Costs

95. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

96. In addition to its refund and statutory interest, Plaintiff is also entitled to its administrative costs, including attorneys' fees.

97. The Defendant must pay reasonable litigation and administrative costs to a prevailing party unless its position in the proceeding was "substantially justified." I.R.C. § 7430(c)(4)(B).

98. Here, the Defendant's position was not substantially justified.

99. In failing to pay Plaintiff's 2020 and 2021 ERC claims that were objectively due based upon the full or partial suspension of Plaintiff's operations as provided for in the clear language under I.R.C. § 3134, the Defendant's position was not substantially justified.

100. Plaintiff's entitlement to the ERCs at issue is straightforward. The Defendant's refusal to promptly pay the ERC refund now past due is, therefore, not substantially justified.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court enter a judgment against Defendant, the United States of America, for:

(A) A tax refund for Q3 2020 representing ERC in the amount of $71,590.95, with statutory interest thereupon;
(B) A tax refund for Q4 2020 representing ERC in the amount of $30,781.22, with statutory interest thereupon;
(C) A tax refund for Q1 2021 representing ERC in the amount of $98,927.70, with statutory interest thereupon;
(D) A tax refund for Q2 2021 representing ERC in the amount of $99,392.52, with statutory interest thereupon;
(E) A tax refund for Q3 2021 representing ERC in the amount of $102,393.97, with statutory interest thereupon;
(F) Reasonable litigation and administrative costs, including attorneys' fees, as allowed by law; and
(E) All other relief as this Court deems necessary.

Respectfully submitted, this 22nd day of May, 2025.

/s/ Keith B. Franklin
E.J. SAAD                  (ASB 8614D51E)
MATTHEW ANDREWS     (ASB 1672E47A)
JAMIE F. LEE              (PRO HAC)
KEITH B. FRANKLIN     (ASB 8196A56K)
*Attorneys for URGENT CARE BY THE BAY, LLC*

OF COUNSEL:

E.J. SAAD LAW FIRM
6207 Cottage Hill Road, Ste. G
Mobile, AL 36609
Phone: (251) 660-0888
ejsaad@ejsaadlaw.com
mandrews@ejsaadlaw.com
jamielee@ejsaadlaw.com
k.franklin@ejsaadlaw.com